Good afternoon. We're here for argument in the Yakubi v. Trustees of the University of Pennsylvania, number 25-2239. And we'll begin with Mr. Vora. May it please the court. My name is Amit Vora. On behalf of the Kasowitz Law Firm, for the plaintiffs, this court should reverse. Yakubi was barred from Houston Hall because he's Jewish. He was subjected to a bomb threat while he was inside Hillel, and he was assaulted while he was putting up posters of Israeli hostages. The barrage of anti-Semitic conduct that he endured destroyed his ability to learn because he was terrified for his physical safety. And Penn's responses? Well, Penn failed to enforce its content-neutral conduct rules to trespass those who had taken over Houston Hall and were barring Jewish students. Penn also failed to activate its emergency notification system to alert Jewish students about a threat of violence to Hillel and Lauder House. And as for the assault, Yakubi reported to Penn Police and Penn Admin. They failed to respond, and that assailant later assaulted a different Jewish student and was overheard telling still other Jewish students to go back to Moscow or Brooklyn. So overall, we've pleaded not only an objectively hostile environment, we've also pleaded that Penn's responses were so deficient, so clearly unreasonable, that they amplified the anti-Semitism on campus. And notice, Your Honors, I have not mentioned speech. Our claim is based on conduct, not speech. We have one act of anti-Semitism after another. And if I may list them, these are all the acts about which Penn was indisputably aware and about which every plaintiff was personally aware. We start with the September 13th vandalism of the Weitzman School of Design. A swastika was spray-painted there. That school is named after Stuart Weitzman, who saved the museum down the street. Then we have the September 21st vandalism of Hillel, where a student broke in and screamed, F the Jews. Then we have the September 25th vandalism of Chabad. Then we have the October 8th rally, the October 9th rally, the October 16th rally that turned violent, the October 18th rally, where a mob targeted Lauder House. Now, Lauder House is named after Ronald Lauder, a Jewish philanthropist. Then we have the October 20th targeting of a Jewish fraternity. Then we have the October 28th rally, where a student called October 7th a joyful and glorious day and then vandalized the home of Jewish students. Then we have the November 6th bomb threat directed at Hillel and Lauder House. Then we have the November 14th takeover of Houston Hall, which lasted for about a month. Then we have the February 18th takeover of Van Pelt Library and the February 26th rally. So we have one event after another, and Penn's deliberate indifference is exemplified by its failure to take varyingly obvious corrective measures, including implementing security reforms and enforcing content-neutral conduct rules against blocking access to campus spaces, vandalism, and violence. So could you unpack for us a little bit more your view and understanding of the deliberate indifference standard? Because, of course, obviously what you're describing is abhorrent and heartbreaking and awful. I mean, the statute before us, at least in the Title VI context, no person in the U.S. shall, on the ground of race, color, national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity of receiving federal financial assistance. So I guess the complexity here, one of them, as you surely know, is that we're talking about behavior by the students, whereas it's Penn receiving the financial assistance. So make for us the connection, how Penn is the target under the Title VI requirement. Yes, Your Honor, under Davis, Gebser, and the weight of appellate authority, the Title VI test has boiled down to, the deliberate indifference prong in particular, has boiled down to whether the institution was clearly unreasonable in responding to known discriminatory acts that constituted the objectively hostile environment. And we fully embrace that test, and we recognize that that test ensures that courts aren't merely second-guessing universities, because universities, of course, should have leeway in navigating sensitive situations like this situation. But wide latitude isn't unlimited latitude. And as Judge Chin described the formulation in Zeno, when responses are not reasonably calculated to end the harassment, they are inadequate, which is shorthand for clearly unreasonable. Is there a time requirement baked in? Is it your view that Penn should have acted within a particular time period to stop it? What would have been reasonable behavior here? It depends on the circumstances, and it depends on the situation. So I'll give you, Your Honor, one example. We had, as I mentioned, the September 16th spray painting of a swastika at Weitzman. Well, two days later, Rubin met with the Vice Provost and the VP for Public Safety and specifically asked them to harden security at Hillel and Chabad. They refused. They patronizingly told him that those buildings were the safest on campus, and they offered him a tour of Penn's security room. Well, two days later, Hillel was vandalized, and four days after that, Chabad was vandalized. So there you have, within days, a specific plea for security, a mocking refusal, and the precise harm that was foretold. So that's an example where a student is pleading for security in a circumstance where there's violence and there's a necessity to act quickly and swiftly, and Penn has dropped the ball. Now, another example is the October 16th rally that turned violent. There, Penn was aware of the violence, failed to enforce its content-neutral conduct rules to disperse the protesters. Judge Cronin, in the Cooper Union case, offers this as a measure that would have prevented Cooper Union from being considered deliberately indifferent. He says the university should have dispersed the protesters as the demonstration spiraled out of control. Penn didn't do that. Then it also didn't launch an investigation into what had transpired. It didn't convene a mandatory training session to remind the student of the content-neutral rules, and it didn't discipline the lawbreakers. And its failure to implement these glaringly obvious measures emboldened those in Penn's community who harbored anti-Semitic attitudes to escalate their anti-Semitic and lawless acts. So if I can just get in— All right, thank you. It was off for a bit. He has been able to see and hear you the whole time, though, so he didn't miss anything, and then we'll just continue from there.  Thanks so much. Sorry I can't be there in person. As I understand this case, it's significant, obviously, from a public interest standpoint. It's also significant from just an arc of the law standpoint, because we don't have, at least I'm aware of, that this circuit has a precedental opinion talking about the elements of a Title VI claim for hostile environment discrimination. Now, we have some for Title VII. We might be able to look at Title IX. We might be able to look at other circuits. But when we're looking for the measuring stick of these allegations that you talk about to say, are these enough to state a claim, the district court said they weren't. But what do you think the key elements in that measuring stick should be? I assume that you think actual knowledge is part of it, because with each one of the incidents that you kind of bring up, you say, and pen new and pen new and pen new. But if we're going to build this out, we also know deliberative indifference is one. So we have actual knowledge and probably deliberate indifference. Those are probably beyond the thing. We also have some degree of control over the harasser and environment seems to be something that people usually want to build in. So I'm getting to three. And then we get the one that kind of always vexes people, which is, is it severe and pervasive or severe or pervasive and then objectively offensive? So that's kind of the sketch of maybe the list of ingredients. But I'm just kind of curious as to how you would put those together. Yes, Your Honor, a number of the ingredients that you've mentioned make perfect sense. So actual knowledge that makes perfect sense to have as an element, because what Title VI is trying to get at is if the situation is within your knowledge and within your control, don't act clearly unreasonably. That's what happened here, though. But I do need to emphasize that the deliberate indifference prong of the test that this court should formulate should not include any sort of requirement that we show that the defendant has discriminatory animus. And this is, we believe, where the district court might have gone astray. The district court says that we failed to plead any facts showing intentional discrimination or deliberate indifference on the part of Penn. And then it says, indeed, the plaintiffs have not shown discriminatory animus on the part of Penn. Now, if that indeed is describing the previous sentence, well, then that's imposing a sort of subjective intent requirement on the Title VI defendant that should not be part of whatever test you formulate. So if I hear you right, all I'm trying to do is trace back. If I'm hearing you right, you aren't saying that animus wouldn't itself be sufficient. You're just saying animus isn't necessary. Yes, precisely, Your Honor, because the test should be whether the defendant knows of the predicate act that constitutes the objectively hostile environment, but it should not be that the defendant itself harbored discriminatory animus. What about – yeah, keep going. I want control and then severe and persuasive if you can get to those. Yeah, yes, Your Honor. So then on the objectively hostile environment prong, that should, of course, be an objective consideration where this court should look to the reasonable student's perspective, the reasonable student in the plaintiff's position. So in this case, it would be, how would a reasonable Jewish student in the position of our plaintiffs experience this environment? And in our case, with the litany of anti-Semitic acts that I've listed for you, a reasonable Jewish student would be terrified for his or her physical safety. So on that prong, there is a requirement, though, and an important one, that the plaintiff must have actually suffered from the environment, that the plaintiff must have actually been immersed in the environment. Because, of course, if a plaintiff lives in California and is reading about these events, the plaintiff might claim that these events are harming him or her, but we don't think that would be sufficient. We don't have those sorts of allegations in our case, though. There are some anti-Semitism cases, some recent ones out there that have been dismissed on that ground. In our case, each of our plaintiffs was subjected to this hostile environment. Each of our plaintiffs, I mentioned 14 predicate acts there, each of our plaintiffs was personally aware of each of those events. Penn actually knew about each of those events and failed to secure its campus for Jewish students. That harmed them. Another part of the test, the last part of the test, is that the plaintiffs need to have suffered a loss of educational benefits. The harm must have extinguished their ability to learn, and that's something that is being lost. That principle is something that the courts in these anti-Semitism cases are forgetting. The point of going to a university is to learn. That's a sacred right. Yes, we have a rich history of protest on university campuses, but we also have a rich history of recognizing that knowledge being the soul of a republic, it's impossible to learn when you're being discriminated against. It's possible to learn when you're immersed in an environment with discriminatory hostility. Professor Fallon made this point very well in an article that Judge Cronin cites in his Cooper Union decision. He says that speech, even about political matters, that is so persistent or patently harassing that it cannot be reasonably designed to contribute to reasoned debate is fine prohibiting. That harmonizes with this court's decision in Sachs. There, it recognized that when speech substantially interferes with students' ability to learn, then that's not the sort of speech that we need to worry about restricting. Now, in our case, our case is based on conduct. We don't even need to worry about the sort of complex issues that arise when you're dealing with the clash between the First Amendment and Title VI. We have a simpler case than those. But those observations are observations about cases where speech was the sort of the predicate. Our case is one where conduct is the predicate. So the principles there apply with even more force here. Here, a case where there's one active anti-Semitic conduct after another that prevents students' ability to learn because they're terrified for their physical safety is one that should absolutely survive the pleading stage. I'm struggling a bit with what I understand your argument to be, that certain words are—tell me if I'm wrong about this—that certain words are so anti-Semitic that they are inherently conduct, if spoken, and even on a university campus and even if related to a matter of public concern. And if that's not right, tell me what I got wrong. Your Honor, that's not our position. Our position is that our Title VI claim is based entirely on conduct. Now, the speech is corroborating contextual evidence supporting our Title VI claim, and it enters into the calculus in two ways. First, it's corroborating contextual evidence that the conduct was discriminatory in character, that the conduct was directed at Jewish students because they are Jewish. For example, chanting helps confirm that the mob that targeted Lauder House on October 18th was targeting Lauder House because Jewish students reside there. That's a Jewish space. Second, these chants enter into the calculus—again, they're not the predicate—they enter into the calculus as corroborating contextual evidence that the reasonable Jewish student in the plaintiff's position hears those chants while also experiencing an environment where rallies are turning violent, where Jewish spaces are being targeted, where Penn is declining to enforce its content-neutral conduct rules to keep Jewish students safe. Those chants become all the more hostile, and that's a point that Professors Bernstein and Sachs powerfully make. Now, Penn will disagree and say that these chants are pure political speech, and they're entitled to that disagreement, but the question whether this speech is anti-Semitic in context is not one that can be resolved in Penn's favor as a matter of law at the pleading stage. I mean, it's a fact question. It raises adjudicative fact issues that warrant discovery. It raises legislative fact issues that are amenable to empirical inquiry and analysis. And this is something that, in our view, the First Circuit got wrong in the MIT case. I mean, none of this can properly be resolved at the motion-to-dismiss stage. We and the MIT plaintiffs should have a chance to develop facts along the lines of Allegation Paragraph 234 in our complaint. This is that allegation. A Penn community member said on side chat, Penn social media, when we say from the river to the sea, that's what we mean. Israel is in the way now. We must clear them out. Yacobi saw this message. So we have to put ourselves in the position of Yacobi, who's seeing this message and experiencing this environment, and then ask, has this message contributed to the environment? Is it fair to say that he's experiencing, reasonably experiencing, an objectively hostile environment? I believe so. We should also have a chance to marshal survey data showing that Jewish students across the country interpret these slogans as genocidal. And we should also be able to proffer linguistic and historical data illuminating the meaning and the etymology of these words. And that approach would harmonize with basic procedural principles, and it also harmonizes with the values of judicial restraint and intellectual humility. The fact finder should decide. But again, Your Honors, this case is not about speech. I've already talked about speech more than is warranted for our case. We have a bomb threat. So on November 6, Penn received emails specifically naming Hillel and Lauder House against Jewish spaces. Penn did not activate its emergency alert system to warn students about this threat. In other words, it knew of a threat to two buildings full of Jewish students, and it left them to deal with and discover the danger on their own. Now, Penn might argue that its choice was reasonable, that there was some reason why it didn't activate its emergency alert system. But Penn's say-so does not control at the pleading stage. That's a fact issue. It's a fact issue, but I think what's unusual about your client's complaint is that it includes many responses that Penn made to the circumstances you've discussed. And, you know, there's no guarantee that what the plaintiffs requested, the specific responses that they requested, are what is necessary in light of all the known circumstances, right? The question is whether Penn's response was clearly unreasonable in light of the known circumstances. And so when you've given us so many facts already that they took action after action, I understand you couched those all with, like, these were inadequate. But I think that's where the district court may have gotten stuck here, was how they seemed to respond, perhaps belatedly, perhaps inadequately, but the district court thought it was not clearly unreasonable under the circumstances. Your Honor, that's precisely a sort of back-and-forth factual battle that we should be having in the district court. I mean, it's more than plausible that discovery will explain why Penn did what it did, and more than plausible that discovery will show a university that was routinely discounting the interests of its Jewish students and was dismissing their serious pleas for safety. I mean, you mentioned that Reuben's security pleas were rejected on September 19th. That wasn't the first time. He repeatedly asked for specific security measures, and he was repeatedly denied. Other plaintiffs as well asked for security. They felt unsafe, and they were mocked and patronized. SAA number two specifically asked, during the Houston Hall takeover, the VP for public safety for security and was patronizingly directed to campus wellness resources. This is the same person who patronizingly told Reuben that Hillel and Chabad are the safest buildings on campus. And then what we have, Your Honor, are our responses. But again, a response is not an adequate response. The deliberate indifference inquiry should be a fact-bound inquiry. Going back to Judge Fitts' point about how we should formulate this test, a defendant shouldn't be able to say, we've responded, case closed, shut down the deliberate indifference inquiry. We need to assess whether that action was reasonable or clearly unreasonable. And in our case, we have situation after situation where, hence, failure to act galvanized responses. I was getting at this when I was discussing the October 16th rally. The failure to secure the campus that day led to a mob targeting Lauder House on October 18th, vandals targeting a Jewish fraternity on October 20th, and the bomb threat that I discussed on November 6th. So you see this pattern where Penn is failing, that's galvanizing members of the Penn community who harbor anti-Semitic attitudes to escalate their conduct. Even the November 14th takeover of Houston Hall there, Penn failed to enforce its content-neutral conduct rules to trespass those occupants. And then we had one anti-Semitic act after another because Penn's inaction paved the way for more lawless conduct. And Penn may say, no, our choices are reasonable. And discovery may unearth a smoking gun. It may exonerate Penn, but that's not the question today. The question today is whether Penn's responses were clearly unreasonable. And that's not a question that can be resolved in Penn's favor at the pleading stage. It has no basis to insist that its own account of its own conduct be credited when the point of discovery is to test whether that account is true. And we've discussed action plan in our briefing in the presidential commission, the student advisory groups meeting. And according to the district court, Penn, by virtue of having done all that, is automatically entitled to a finding that it wasn't deliberately indifferent. But our pleading includes voluminous allegations about why each of those responses were not only deficient, but clearly unreasonable to use MIT's formulation. They were so lax, so misdirected, so poorly executed that they made the problem worse. I know there's a lot of analysis about this out there, but may I just ask you, so going back to the text of the statute on the ground of race, color, or national origin. So, are we here dealing with religion, race, like walk me through the category of discrimination that you are focused on. We're focused on race and national origin, Your Honor, and a number of courts have discussed this issue, the federal government has discussed this issue, and there appears to be a consensus that Jewish identity and Israeli identity trigger the protections of the statute. Is it your position that religion, just general religion, is covered or should be covered under Title VI? No, Your Honor, because there are particularly reasons why Jewish identity is covered under the statute. It's because it's tied to ethno-racial characteristics associated with it. So it'd be different from, it's different from other religions in that respect, and courts have had no problem recognizing that we would protect this particular identity, Jewish identity, under Title VI. And Penn doesn't dispute that. Okay. Anything else, Judge Phipps? No, thank you. All right, we'll hear you back on the rebuttal. Mr. Wexler. Nice job. May it please the court, I want to look at all of you all at once, it's a little bit difficult, so no offense taken if I'm... As the Supreme Court taught in Davis versus Monroe, quote, there is no reason why courts on a motion to dismiss cannot identify a response as not clearly unreasonable as a matter of law. That is this case. Because Title VI prohibits only intentional discrimination, Davis holds that an institution is deliberately indifferent only when its response to known pervasive and severe acts of harassment is clearly unreasonable in light of the known circumstances, reflecting a conscious choice by the institution to be indifferent. That gloss on the textual prohibition against intentional discrimination reflects a demanding standard by design. Now the complaint in this case covers many, many, many instances, most of them, by far most of them constituting constitutionally protected expression, but also many acts of anti-Semitism. Now my friend on the other side started off by recounting a litany of acts, and I'll simply rather than give a tit for tat response. I will simply refer the court to pages seven through 13 of our brief, which act by act goes through and provides the evidence in the complaint, or the documents referred to in the complaint as demonstrating what Penn's responses were. The documents that are referred to in the complaint are included in the append the joint appendix at pages 283 to 375. Now I can, I can attempt to remember what all of that says if the court wishes, but our responses rely on those documents, excuse me, I'm not sure that we can rely on the truth of everything that's stated in those documents I understand that that plaintiffs mentioned that Penn issued statements on certain dates, and we can certainly look at the content of those statements and say, you know, I guess, that Penn said those things but to the extent that those documents that the pages you decided say, you know, Penn did X, Y, and Z, I don't I don't know that plaintiffs have agreed with what Penn said. So we are, we are talking, we are talking about the case I'd say, you know, from your court is pension benefit guarantee corporation versus white consolidated industries which holds that a court may consider an indisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss. If the plaintiffs claims are based on the document every single one of those documents is based is a there is a claim based on that documents for example, at pages. Gosh, what were the pages. I'll remember in a second. The plaintiff's complaint says, look, the action plan to combat anti semitism never did anything, and you even look at, and they specifically reference a document dated January 16 2024, showing that it was just all that they did was mouth platitudes In fact, that document is referred to in the complaint, it is mischaracterized as a complaint, it is included as an attachment to our motion to dismiss entirely properly, and it shows the number of arrests that were made the heightened measures of security that were addressed that is all the court is not only permitted but required to consider that in a motion to dismiss, I think we're required to consider that that pen said those things, but it would it would really be the hearsay to to credit the truth of everything pen said in those statements. Look, I will be very happy. I think what this court has said is that a conceitedly authentic document referred to and relied upon in the complaint is properly considered and a court, considering a motion to dismiss must consider in evaluating whether the complaint should be dismissed but even if that were not the case. Even without the documents that we have attached in written in support of our motion to dismiss that are specifically referenced and just misdescribed in the complaint, the complaint itself shows for example, that. And the complaint acknowledges that pen responded, not only in the particular ways we address in pages seven through 13 and in the reference documents. But that pen created within weeks, an action plan to combat anti semitism that included specific enhanced security measures, police involvement, a presidential task force to implement the plan that had periodic status reports, one of which is specifically an allegation the subject of an investigation in the complaint, a student advisory group to the president and provost repeated statements by senior leadership with respect to this particular instances that my friend is addressing, and they profoundly disturbing circumstances, facing. If not Jewish facing Jewish students and particularly Zionist students at the university in an extra and what everybody concedes is an extraordinarily unique situation when for the first time in our nation's history. Universities were confronted with a fierce convulsive political dispute, where both faculty and students were equally divided on both sides and accusations were made and this court certainly knows from Judge Phipps decision in the Fokker Dean versus University of Pennsylvania case allegations and lawsuits brought against the University of Pennsylvania on both sides for being too harsh on them, and too soft on the other side. And in the context in which pen is responsible for its own acts it is responsible for a determination that this that if the complaint can fairly be read to show that pen made a conscious choice to be indifferent to acts of anti semitism, then the judgment should be referred that courts dismissal should be reversed, but that is simply not available, but clearly unreasonable. I mean, pens grievance. I think you're right at one level you say look read our responses in pages seven through 13 of our of our red brief that's that's that's where we have the answers and that's where we want you to evaluate reasonableness. But, you know, just Freeman was asking a question about, like, how much of that can we really get into you know how much of that is really appropriate at this stage. And, and, you know, we're talking about this action plan to combat anti semitism, which is probably, you know, if you want to sit there and say, hey, of all the things we did, which, which one do we want to hang our hat on the most for showing that we're on unreasonable that's probably getting close to near the top of the list, maybe. But I guess in your brief you say quote the plan was this is on page 12 quote the plan resulted in a significant increase in security across campus, including at every event in protest and strengthen security for pen affiliated religious life centers. That's that strikes me is really like a statement of fact, not, you know, I mean, you say, hey, now we've got now we've got increased security everywhere. Maybe so, but, but I don't know. I don't know that even under our most kind of, you know, look at the attachments sort of sort of world for evaluating motions to dismiss we get to go and make a decision about a significant increase in security across campus, including at every event and protest. So that that's that's the nub of my question, but I also built in something early on, which said, hey, of all your responses, what do you think is the is the most reasonable? Is it this? Is it this action plan? Or is there something that you say? No, no, we've got better. So two questions. I leave it to you to touch on how you want to go. Well, let me let me address, you know, Penn was certainly aware, and there are repeated statements and acknowledgments by Penn, and by institutions that Penn created in light of what happened and, you know, increasingly happened over the fall of 2023. That, yes, there's that there's an action plan, which was set in place a task force that was created that nobody disputes work assiduously to implement the action plan and I've referenced their reference to what had or had not been done by the 16th as reflected in the report that they referenced in their complaint, which is attached. The university created this student advisory group. Now, the only thing we know about the advisory group is that Mr. Rubin, who was appointed to it, and who, along with Mr. Yacobi are the two were the two foremost pro-Israel speakers and actors on Penn's campus. Mr. Rubin went to the first and only the first meeting, and after reciting the complaint recites that the administration listened for two hours to the students explanation of what was going on, but he discerned that they were uninterested. That's the allegation that Penn also created as the situation evolved and its response evolved, a presidential commission on countering hate and building community which also worked assiduously and produced results. There is no doubt, they allege that as a result of what was happening Penn station both police and community, open expression observers at these protests. My question though is is that is that the standard that Penn did something I mean because I know we're looking at deliberate indifference, but the statute is be excluded from participation and be denied the benefits of subjective discrimination. So if we're in a universe where that can be established by third party activity isn't the standard, to a degree, about whether I mean whether the students were able to finally feel safe to participate, not be subjected to discrimination and not be denied the benefits of which would mean the deliberate indifference standard has to have some relation to whether what Penn did actually worked, I mean, do you see what I'm saying, I do see what you're saying, and I think my response is the Supreme Court has been very very clear that universities are not schools even even public high schools and elementary schools are not held to a standard of producing successful results plaintiffs are not entitled to claim that when a school acts doesn't act in a particular way to the plaintiffs liking that that is a standard that title six allows, or the statute itself would permit because it is only intentional discrimination by the school that does this now with respect to let's just go and I think this is also in part of response, I hope to your question, but also to judge about like what's your best example what's in the complaint that we can see. Let's look at the five instances in which they as these plaintiffs assert that they themselves were subject to actionable harassment as to which pen had an obligation to not act in deliberate indifference to it. The first one that my friend mentioned was, I believe what he called the bomb threat, what the complaint actually alleges and the supporting documents show is that an email was sent to someone in Penn administration, threatening violence against Jewish institutions, including and they specifically mentioned Hillel house and louder house. Now, what the, what the complaint itself reflects, and the attached and the documents referenced in the complaint reflect is that it was immediately investigated. The both of these facilities were secured, there were, there was a bomb threat sweep of both facilities, the conducted in conjunction with the FBI which was immediately alerted by pen. There is a judgment call about whether that was an adequate response or not to immediately investigate immediately sweep all the relevant buildings call in the FBI. They say well we should have there should have been an alert telling everybody to evacuate all buildings, all buildings that include Jewish students or Zionist activities. That's a judgment call we can you may have an opinion that they are right that there should have been a call to sort of get everybody out of these buildings immediately. Maybe I agree but that's not the test. The question is, did this reflect a deliberate choice, not to take reasonable steps in the face of this, and I think it's important here. I hopefully this answers your question judge mascot to distinguish between a university that abandons its students, and one that engages, perhaps imperfectly with an extraordinarily difficult situation and novel situation now the second thing that my friend mentioned was Mr. Yacobi being somebody came up to him and yelled a profanity at him when he was hanging posters, showing Israeli hostages from the Hamas outrage on October 7. Now, let's leave aside the question of whether the person who issued the profanity did it because he felt so strongly about the Palestinian cause or because he discerned that Mr Yacobi was Jewish, let's just assume it's the latter. He reported it to a police officer the police officer undertook to investigate. Indeed, pen alerting the Philadelphia police. A few hours later arrested this individual for another anti semitic assault he made. They say well that's not enough because one month later. Actually I'm missing up my mixing my examples here. Not being deliberately indifferent and we don't have a police officer saying or reporting to the administration that, hey, this kid is complaining because somebody was issuing profanities at him but let's not do anything. The third and fourth examples are the incidents that occurred to the plaintiff Jordan Davis who was at the time a freshman at Penn, who reports that on two specific instances when she was walking by a large pro Palestine rally in which all of these sort of anti Zionist slogans were being yelled on the side of the rally. Three people were in the first instance one person with his head covered by a kaffir in the second instance three people whose heads were covered by a kaffir issued unquestionably anti semitic slurs at her. Now the question is whether what the university did in the face of what was known to the university reflects deliberate indifference to a level of harassment that warrants relief. She acknowledges and the complaint reflects that she at no point reported the first instance. As to the second instance, she reported it entirely anonymously, there is no indication whatsoever that she provided the university, any way of identifying who made the report, or who made the speeches, I assume that would be because she was afraid of retaliation. It may very well have been. Let's assume as a predicate that it is the focus here is not on what happened to her which was awful. The focus is on whether pen in learning this information consciously decided to do nothing when no information was learned, other than that on one instance, an undergraduate student was the subject of anti semitic slurs by three people on the edge of a demonstration, who had their faces covered, unless, unless what they were being alerted to was that that set of circumstances in conjunction with all of the other issues we're discussing, led to a pervasive environment where just a whole class of students felt like they couldn't participate, in which case it would almost be irrelevant whether the pen and information respond to that particular one because there might just be a pervasive environment, they have to be, you know, addressing and more systemically. First of all, the courts have been including including this court the courts have been entirely clear that the point of course there's lots of context involved in what was happening on campus and in other circumstances, but the plaintiffs have to identify and their case rises and falls on the specific acts of harassment that occurred to that, that they themselves experience this court in the LL versus evasion township case made that clear but looking at it more broadly as your honor, your honors even if you want to say take in the September events that are alleged in the complaint reflected a conscious choice not to take any reasonable steps, was this a conscious choice to be indifferent, and we can have a debate about whether it's the action plan the task force the presidential commission, the increase in the coordination with the Philadelphia police and the FBI, whether it's stationing police officers at these demonstrations, whether it's making available an escort service to anybody who needs it that is reflected over and over and over again in the pen communications at the time. If this court can say that all of those actions reflect a conscious choice to be indifferent to the anti semitic scourge that blossomed in the fall of 2024. Then Judge Goldberg was wrong, but I maintain that looking at the four corners of the complaint, and the allegations fairly construed there. This is simply not a case in which you can say that pen exercised intentional discrimination against its Jewish. I want to ask you about the October 16 incident involving this Davis that the one that you referenced moments ago where where slurs were yelled at her. I, I believe you included that in the list of actionable harassment items is that great and I have one more that I haven't gotten to yet. That particular incident considering I'm not going to repeat the words that were said but I'm sure you recall, would you characterize that incident, standing alone as severe. That incident was certainly yes. I mean, an anti semitic slur of the nature alleged there was certainly a severe incident, and so it's so under our law that says severe or pervasive at least with regard to Davis she has satisfied that aspect of the standard. Correct. Well, that the standard is and we're now dealing with not the standard for deliberate indifference but the other half of the test. It has to effectively bar the victims access to an educational opportunity or benefit or as this court stated in its decision in the Whitfield case, it has to have produced a systemic effect on educational programs or activities and so while I. So, I mean, Davis in particular, I guess, part of what I'm getting at is, I think, there, there may be another incident there's October 9 incident involving was Davis with also involves ethnic slurs that I hope the one. She says he was walking to class wearing a star of David necklace and protesters directed some some quite foul. I think slurs toward her. Would you also agree that that was severe. I can't remember exactly what the allegations were the alley, the actual acts that she alleged are the two comments that occurred as she was passing by the demonstrations in neither of those instances to and have any knowledge on which it could even act with respect to her. She says and I completely understand this having been in her position in my life that she, you know, went back to her room was unable to go to classes for a period of time. None of this was reported to pen. And since the focus here is on pen not on the environment. That's essentially the issue in this case. The plaintiffs argue that because these, these things happen for credit that they happened. And some of them happen to individual plaintiffs, they, they allege that all plaintiffs heard about all incidents I'm not sure that's that's fully been pledged in the complaint but assuming that's true. Would we do what is your take on on the effect of these severe incidents on individual plaintiffs, and how we should consider that with regard to whether all plaintiffs have have stated a claim. I mean, this case this court's decision in the evasion township case, which just which dismissed as to all of the complaint if all of the plaintiffs except the one who alleged that she repeatedly suffered sexual or racial harassment herself, not the other plaintiffs who knew about it and heard about it and intimidated it. I think answers that question. Let me just finally address because I don't want to be accused of having not mentioned it this so called takeover of Houston Hall, and whether pens response demonstrated deliberate indifference to acts of anti semitism. First of all, Houston Hall is a building. What happened was there was a group of students and faculty called the Freedom School, which occupied for a period of, I think just under three weeks, one room in that building, and the allegation, there are two allegations here. One is that Ruben and Jacoby, the two most publicly identified pro Israel spokespersons and organizers at Penn during this terrible period were asked to leave. Now, we don't know whether they were asked to leave because they're Jewish or whether because they were they were delivering a message that was the opposite of what was being done. You know, Penn. This was a situation in which Penn worked for three weeks to try and without the in without the involvement of the police to eliminate this occupation. And eventually did now should Penn have acted sooner should it have done for example what Columbia did with its own consequences in bringing the police bringing in the police early to evacuate people from a school building. Maybe, maybe so. But the one thing we actually know from the allegations of this complaint is that Penn did learn its lesson, because when a few weeks later, the Freedom School sought to occupy the library the van Pelt library. They were removed that day. And we can have a disagreement about whether Penn should have done what the plaintiffs say Penn should have done which is call in the police and evict those students and faculty members on that day, or not, but the notion that this reflects a conscious choice by Penn to be indifferent to anti semitism, even if this in some somebody's view was anti semitic as opposed to anti Zionist pro Palestinian is simply not it doesn't work it doesn't establish into intentional discrimination by Penn against Jewish students. That's the best. I'm sorry. You know just doesn't matter if, if we're looking at things in terms of the reasonableness of Penn's response. If Penn takes one action but then events get bigger, and then they take another action and events still get bigger now I know that some of these events were worldwide events it's very hard for a university to say oh we could have stopped, you know, you know, October 7 or something like that no one's putting that on pen, but, but the events seem to get bigger. They seem to keep growing. And so, what does that mean when we want to look at the reasonableness of response usually, you know, you like to see a response that's efficacious, if a response is truly efficacious then you say okay good that was reasonable. When you, when you have responses that lead to one act after another act a similar type of act another similar type of act. Over time, does that color at all where we are, or what, what's the time aperture that we should say we should we say that, look, you can't, you can't turn around a battleship on a dime, you know, you give pen, give pen 30 days give pen 60 days give pen 90 days to work at this, how do we measure reasonableness because it strikes me that pens a step behind. For a lot of the events in questions what they've done is kind of, yeah, they did something but something bigger just happened. When you say is pen is behind in terms of the events in question, are you referring to these individual acts of personal harassment, or are you referring to the atmosphere on campus and these vitriolic demonstrations because my answer would be somewhat, I want to make sure my answer is titrated to your question. Yeah, no, I mean, I mean, I think, I think when we want to talk about environment, I don't know that we can disaggregate those quite as fast right like like like I get it, it would be nice to just titrate or isolate, but we've kind of got these these two things going on now blurs with speech it blurs with other things and I, and I know that. But it does strike me that you're that pen, you know, the notion is pen let this get bigger, at least in as I read the complaint that's kind of a theme in it, you think you think that that's wrong you think I'm looking at a narrow time period. I think it is wrong I don't think the complaint alleges that things got bigger over time and in fact, well, let me leave the in fact aside. No, I'll go with the in fact, when Judge Goldberg, this was a complaint that was filed less than two months after October 7 in a situation that everybody in this country knows was evolving was convulsive and involved hard feelings and vitriolic speech on both sides. Now they have when we move to dismiss. They amended their complaint, four months after October 7 when Judge Goldberg dismiss this case, he specifically invited them to file an amended complaint which they did not for the very patently obvious reason that at that time, all of these steps and initiatives that pen had undertaken were done, and the reports were made and changes were made I mean pen, just a few months after long before Judge Goldberg ruled pen establish what is now what was the first and is now the only office in a university, that is an office devoted to anti semitic with what's in this actual complaint. Yeah. Okay, so the point about this is, I think what the complaint reflects is not that things got worse, in the sense that the demonstrations got bigger, or the individual harassment got worse that the events that they're alleging in this complaint or events that occurred in October and November, what does what the complaint does show is that pens response changed over time, pen, you know, decided to install police at these demonstrations decided to install observers at the demonstrations, it increased it coordinated with both the Philadelphia police and the FBI over these incidents, it, you know, created these things it you know it dealt with one. The occupation of one room in one building in a way that was deliberate maybe too deliberate and too slow and followed it up with the next demonstration by the same people by removing them on the very day that it started. And if anything is evolving here I mean we talked about a reasonable period of time and what is reasonable, we're talking about a document even the amended complaint that is only four months after the convulsive events the horror of October 7 occurred and changed everything on college campuses. And you can say well maybe they didn't change enough that the notion that the notion that this. I mean let me quote Davis again citing gaps are the university, or in that case the school is liable, only where the school's own deliberate indifference effectively caused the discrimination to occur, that is the, that is the Davis and gaps are standard. Under the intentional discrimination standard that the Supreme Court has articulated and imposed on title six. I mean, Judge mascot I'm, I think probably as familiar as anybody with the language of title six having lost L argued and lost Alexander versus Sandoval which which imposed the, the, the intentional discrimination standard, but the Supreme Court that was a five to four decision in which the lower court had basically said, look, universities are not responsible for student on student activity period. And the Supreme Justice O'Connor wrote an opinion for a five justice majority saying yes but this is the highest of high bars because we are imposing we are permitting a deliberate indifference gloss on intentional discrimination, which has to equate to the school itself being responsible for this environment, and that test is nowhere near met in this case. This is a case of a university that certain that did anything but abandoned its students. It was a situation that engaged allegedly imperfectly in an extraordinarily difficult situation. Thank you.  Your Honors, my friend. On the other side is doubling down on the district records error, which was to ignore the plaintiffs luminous allegations specifying why pens responses were clearly unreasonable. We detailed, or the action plan was insufficient, or the task force was efficient, insufficient, and we can have that factual battle, but that factual battle cannot be had on the pleadings. And I think one particular argument in the red brief really drives this point home, the referee pens brief says Penn police immediately responded to conduct the violated pens policies in the law. Well, we can't take their say so for and it says immediately, how's one supposed to judge that pen immediately responded on the pleadings and we have alleged the opposite. In fact, with the Houston Hall takeover Penn police initially trespassed students, then Penn police changed course and let the students sit stay that galvanized them, and they ended up staying a month. So we were entitled to discovery to figure out what pens calculus was the pen tell and please to stand down, and why, and all their documents, showing that pen, not showing the pen had discriminatory animus for Jews, but that pen was discounting the interests of Jewish students as a matter, as a matter of course, and was ignoring their pleas for safety, and that would state a claim for deliberate indifference because the test is not a conscious anti semitic choice. As my friend on the other side is getting close to saying which is what the district court appeared to believe the test is whether the school's responses were so lax so misdirected so poorly, poorly executed that they amplified the discriminatory environment on campus. So that's actually a question I have so you're saying your position is that there doesn't actually have to be any discriminatory showing of pen that the discrimination was the student on student harassment, and then pen had to be deliberately indifferent to stopping that. Yes, it sounds like counsel on the other side is saying, pen had to be so deliberately indifferent that that's stemming from anti semitism or discrimination, and not treating them the way they would another group. The former approach is the approach that the majority of circuits have adopted, and that approach is up. It is a shorthand for intentional discrimination. So when a university is deliberately indifferent to known discriminatory acts that as a matter of law satisfies the requirement that university be intentionally discriminatory, of course, some actor within the space must have discriminatory intent, and that would be the harassers, the students, and that's what distinguishes a case where a university or a supervisor directly discriminates against the student from a case where students are discriminating against other students, and that still creates liability through the hostile environment framework, and that's how our discriminatory or anti discrimination sessions work. Now, on the bomb for it. My friend on the other side call this a judgment call, but again, on the pleadings, we have no factual basis to evaluate the adequacy of that judgment call, and this is, we should be able to ask, why didn't pen activate its emergency alert system. Why did it choose to let these students discover the danger on their own. You Kobe and Ruben were sitting in Houston Hall, when they saw Bob sniffing dogs. Enter. They then contacted a pen administrator, who at first equivocated and denied that there was anything wrong, and then admitted, yeah there's actually a bomb threat. Now that sort of botched response. Maybe pen had reasonable reasons for doing what it did, but we're entitled to discovery to determine what what what happened there. Now, with the Kobe result. So my friend gets some facts, just a couple more seconds to wrap up. Okay. Then, in that case, rely on the briefing for the result which explains what happened. For Davis, I think this point is important because it helps build out the framework, Judge Phipps that we were talking about the knowledge element when the. We're just discussing what the university needs to know the university need not know, with respect to each predicate act. The identity of every victim, and every harasser involved university needs to know that the event occurred. And that makes sense because if the university knows that the event occurred, that means the university could have done something about it. And we pleaded with numerous allegations we've made clear that pen knew that the event on October 16 occurred because Davis reported it through the bias reporting system, open expression observers were there they have the power to monitor to intervene and to report. But, because this goes to my friends point that educational opportunities need to be extinguished they absolutely were in our case, our students were terrified for their physical safety couldn't sleep for weeks missed classes. And you Colby one set a note pen administrators, this was after the swastika before the bomb threat, and a professor had been invited to campus and a professor I declared, if a Zionist breeds near me I will destroy them. So you're Colby in a note wrote the pen. We do not want to be destroyed. We want to be educated, and his words capture the animating purpose of title six university is a place for learning. And title six ensures that every student can learn free from the mind killing effects of discriminatory hostility knowledge being the soul for a public, the right to a discrimination free education, sacred you Colby and his peers have more than adequately alleged that they were denied that right, and they have earned the chance to proceed beyond the pleadings discourse in reverse. Thank you to both sides for your arguments.